RM ENGINEERED PRODUCTS, INC.

v.

UOP, INC., et al.

Civ. A. No. 88–2496.

United States District Court,
W.D. Louisiana,
Shreveport Division.

Nov. 26, 1991.

Marvin I. Oberman and Harold Oberman, Oberman & Oberman, A. Arthur Rosenblum, Charleston, S.C., John M. Madison, Jr. Wiener, Weiss, Madison & Howell, Shreveport, La., for plaintiff.

Kenneth L. Salmon and Kevin B. Watson, Katarincic & Salmon, Pittsburgh, Pa., Kenneth Mascagni, Cook, Yancey, King & Galloway, Shreveport, La., for defendants.

## MEMORANDUM RULING

STAGG, District Judge.

Plaintiff, RM Engineered Products, Inc. ("RM"), is a South Carolina corporation with its principle place of business in South Carolina. Defendants, UOP, Inc. and Wheelabrator Air Pollution Control, Inc. (collectively referred to hereinafter as "UOP"), are Delaware corporations with their principle place of business in Pennsylvania. Plaintiff sued for breach of a contract for goods and services provided in connection with the lining of an absorber outlet duct at Henry W. Pirkey Power Plant ("Pirkey") in Hallsville, Texas. Plaintiff seeks $387,335.24 as payment for the lining provided. UOP counterclaimed against RM for fraud, contending that RM knew the lining was defective when it was sold to UOP, and for indemnity in the amount of $558,602. This court has jurisdiction based upon diversity of citizenship and the amount in controversy exceeds $50,000.

This matter was tried to the court from Monday, June 24 to Saturday, June 29, 1991. Pursuant to the hours of testimony heard and voluminous documents received as evidence during those six days, the court makes the following findings of fact and conclusions of law. At the time of trial, the court ruled that UOP had not proven its claim for fraud against RM; therefore, the court will not deal with that issue in this ruling.

## I. FINDINGS OF FACT

### A. Background

Pirkey Power Plant is owned and operated by Southwestern Electric Power Company ("SWEPCO"). The Pirkey Plant uses a type of soft coal, or lignite, as fuel for its boiler to produce electricity. The lignite used at Pirkey had a relatively high sulfur content and, therefore, because of federal and state regulations, SWEPCO needed to install a $SO_2$ scrubbing system or flue gas desulfurization component ("FGD"). The purpose of the FGD is to reduce the particulate and gaseous emissions produced in the boiler to acceptable levels before reaching the atmosphere.

Components of the FGD system include an electrostatic precipitator ("ESP"), inlet ducting and force fans, bypass ducting, four absorbers, an outlet duct, a mixing chamber in which the bypass, outlet and inlet transition ducts converge and the stack. The ESP's function is to remove

particulate emissions from the boiler. Downstream from the ESP is the force fan or inlet duct fan ("ID fan"), the purpose of which is to force feed the continued progression of the gaseous emissions of the boiler and any remaining particulate matter through the inlet duct or bypass duct of the system. The bypass duct rises vertically from the inlet duct to a point just upstream of the stack and just downstream from the end of the outlet duct to an area known as the mixing chamber. Untreated gaseous products and any remaining particulates thus could be "bypassed" directly to the stack. The amount of emissions passing through the bypass duct is controlled by a bypass damper. The emissions to be treated, and not bypassed, continue through the inlet duct and pass through the inlet damper. From there, the emissions pass through the individual pre-quench or pre-saturator sprays into one or more of the four absorbers. The purpose of the inlet damper, when used in connection with the outlet damper, is to isolate the absorbers from the passage of gases and heat so as to be "man safe" for the purposes of maintenance and repair of the absorber components. The pre-quench sprays quench or reduce the temperature of the hot gases as they pass into an absorber.

The absorbers, as designed by UOP, are four in number and are known as Scrubbers A, B, C and D. The $SO_2$ rich flue gas comes in contact with a limestone slurry, and the $SO_2$ is to be "absorbed" by a chemical reaction that produces calcium sulfite, calcium sulfate and carbon dioxide. This chemical reaction takes place first in the lower loop sprays. The flue gas, having been supposedly quenched to its saturation level and some of its $SO_2$ removed, then passes through the trap-out tray which is designed to keep the slurry from the two loops from mixing together. The rising flue gas then contacts the dual flow tray to ensure proper gas distribution within the absorber and then continues on to contact the upper loop sprays. These sprays remove the remaining $SO_2$ through the chemical reaction previously described. The continuing treated gas passes through the demister trap-out tray, then enters a two-stage demister system before passing through the outlet damper and exiting the scrubber vessel through the outlet damper. The first stage of the demister is designed to remove entrained slurry droplets and was water washed continuously (top and bottom) for purposes of cleaning that stage. The second stage of the demister provides final demisting of entrained water. The treated and cooled flue gas then passes through the outlet dampers into areas known as Ducts No. 6. The four Ducts No. 6 then enter into the outlet known as Duct 7. The outlet duct extends from the dampers on the outlets of the four absorbers to the junction of the bypass duct. This final area is referred to as the mixing chamber, or the stainless steel stack inlet transition duct. The treated gases then pass into the mixing chamber which is the convergence of the bypass duct and the outlet duct and the inlet transition duct. From this point, the gases exit into the stack of the facility.

The outlet duct is the focus of this lawsuit. The purpose of the outlet duct is to collect the flue gas from each absorber and channel it into the power plant stack. The dimensions of the outlet duct are approximately 80 feet long, 40 feet wide and 25 feet high, with the surface area of approximately 12,000 square feet. The interior of the outlet duct is fabricated of ¼-inch steel plates. This material is subject to the corrosive action of the emissions from the absorbers and, therefore, must be protected by a corrosion resistant lining.

Sargent & Lundy ("S & L") is an engineering firm that designed the overall specifications for the Pirkey Power Plant and acted as consulting engineer for the project. S & L deals almost exclusively with the power industry, primarily in the United States, designing power plants for clients which include both fossil fuel power plants and nuclear power plants. Although S & L was responsible for determining that the performance parameters and guarantees were met, it did not design each particular component required to satisfy the performance that these parameters specified. For instance, S & L did not design the FGD system constructed at Pirkey Power Plant.

SWEPCO contracted with the Air Correction Division of UOP to design, manufacture, furnish and deliver an FGD system at the Pirkey Plant. As part of this agreement, UOP agreed to provide labor and materials necessary to install a corrosion resistant lining system in the outlet duct leading from the scrubber to the power plant stack.

## B. Initial Contract Negotiations

Donald Brock was the Director of Sales for the Energy Products Group of RM in 1982. He was responsible for marketing the RM 8000 and RM 8000 LT as well as flouroelastomer expansion joints. He made a presentation to several engineers working on the FGD system concerning the RM 8000. He told about testing and application of the product in the field and suggested that these engineers visit job sites where the RM 8000 was applied. UOP representatives visited a plant in Marion, Illinois, which had used the RM 8000. RM provided UOP a list of other users of RM 8000. On May 9, 1983, RM Engineering made an unsolicited written offer to UOP to furnish and install a spray-on lining, *i.e.*, RM 8000, to be used in the outlet duct. On August 3, 1983, RM revised its offer. S. & L recommended and approved the use of the RM 8000 in connection with the outlet duct. Approximately six invitations to bid were issued as to the duct lining.[1] Specifications were attached to these invitations. This invitation contained Specification No. 78–406–1370, June 4, 1982, Revision O.

UOP granted RM the project and subsequently entered into a written contract with RM regarding the lining work at Pirkey. RM also contracted with UOP to manufacture, supply and install certain expansion joints for use in the outlet duct.

It is interesting to note that neither party was able to produce a fully executed copy of the contract with all agreed-upon attachments. Normal practice is for UOP to send a contract to the vendor for signing, have it returned to UOP for signing, and then send a copy to the vendor for its files, retaining a copy for UOP's file. UOP contends that the specifications applicable to the RM–UOP contract are No. 78–406–1320. These 1984 specifications provided for *different* chemical environments than the specifications attached to the Invitation to Bid. Lou Lausten of UOP recalls receiving the signed contract. He does not know, however, where an executed copy can be found. The earlier specifications noted that the pH in the outlet duct would range from 1 to 3. The later specifications noted that the pH would range from 1.5 to 8.[2]

This court believes that the later specifications were not attached to the contract which RM Engineering Products, Inc. signed. Mr. Lausten was directly involved in contract negotiations. Although he believes that the 1984 specifications apply, his testimony proves otherwise. Mr. Lausten stated that if there was a change of this magnitude in the pH levels, it would be important enough to call to the vendor's attention. Mr. Lausten stated that he would do this by transmitting a revised specification to the vendor asking for a rebid. Mr. Lausten would also ask the vendor to write a letter to advise him concerning the impact that this change would have. Furthermore, Mr. Lausten stated that if there was a change within the specifications with which Mr. Lausten was dealing, he would distribute a memo and would note the change in the specifications as reflected in a revision. A letter from Mr. Lausten to RM dated February 19, 1984, does not reflect a change in the specification; this letter is dated one day prior to the revised specifications. No correspondence was produced indicating any change in the specifications was communicated to RM.

## C. RM 8000

### 1. *Application*

On May 8, 1984, RM began applying the RM 8000 lining to the outlet duct at Pirkey.

---

1. One vendor sold a copolymer flouroelastomer while the other four sold a product known as Pennguard Block.

2. Acids and caustic materials are measured on a pH scale which runs from 0 to 14. Anything below 7 signifies an acidic condition, while readings above 7 signify a caustic condition.

RM 8000 is a fluoroelastomer terpolymer. A fluoroelastomer terpolymer is a combination of three monomers that are polymerized together to make the polymer. These three monomers are vinylidene fluoride, hexaflouropylene and tetraflouroethylene. These monomers react with one another to hook together in long chains under radical species polymerization so that the lengths of the chains and the molecular weight becomes very high. The characteristics of the materials involved are changed to the fluoroelastomer polymer from the individual monomers, which are gases. This lining is particularly suited for the acidic environment normally anticipated in an outlet duct of this type.

Tom Keenan was responsible for quality control and application of the RM 8000. His job was to assure that all specifications were met, although he did not personally apply the lining. Bruce Fletcher was the construction superintendent for UOP and was Mr. Keenan's contact at Pirkey.

The successful application of the coating to the steel surfaces requires that they first have to be scored or roughened by sand blasting. The resulting irregularities are called profiles. After sand blasting the steel substrate, the resulting profiles read between 5.5 mills and 7.5 mills. The subcontractor began to apply the first coat of RM 8000 to a total of ¾ to 2.5 mills. Mr. Fletcher and Mr. Keenan checked this first coat quite extensively, as the first coat is the most important. The first coat fills in the profile and provides a good base for the rest of the applications. The entire first coat was spark-tested. This test is performed with a battery which has a wand attached with a sponge soaked in a solution on the end. If a liquid permeates the tube, then a buzzing indicates that the coat is porous. Solvent entrapment tests were also performed upon the coating.[3] This test guards against delamination or separation from the surface. Mr. Fletcher noted that the first application of the lining was found completely acceptable after spark testing and solvent entrapment tests were done.

The solvent entrapment tests for the first coat were extensive; after that, the tests were done sporadically throughout the coatings. After the second coat was applied, approximately 12 to 15 mills were on the surface. This coating was also spark tested and solvent entrapment tests were performed. After the third coat, all readings met applications specifications, as well as after the fourth coat. After the final coat, the coating showed 40 to 55 mills. Mr. Keenan then performed spark testing and solvent entrapment tests and took millage readings. He ensured that the coating was applied as uniformly as possible and that all concerned did their job as well as humanly possible.

On June 6, 1984, Mr. Fletcher observed that a total spark testing was done of the coating and only two leaks were found at the manhole door. These leaks were satisfactorily repaired.

UOP contends that the RM 8000 failed upon application. UOP argues that the initial substrate profiles were never met, as RM's subcontractor used sand to sandblast away rust blooms instead of using flint. UOP's expert, Dr. Gerhardus Koch, testified that use of sand will change the profile such that the RM 8000 will not adhere properly. This is the *only* evidence of a failure upon application. This court can find no other evidence showing that failure was immediate; in fact, the coating was inspected several times after its original application and was never found to have failed until February of 1986. This court believes that if the failure was immediate, substantial damage would have been noted long before February 1986.

In fact, Mr. Fletcher considered RM's work to be relatively free of complaints. Any problems which Fletcher noted were corrected to his satisfaction. He believed that RM did a good job of application and did better workmanship than that done by

**3.** UOP makes much of Mr. Kennan's changed testimony at trial. At his deposition, Mr. Kennan stated that he did not spark test or perform solvent entrapment tests on the lining. Nevertheless, his change in testimony is made more believable by the corroborating testimony of Mr. Fletcher and Arne Melson, who witnessed the tests being performed.

ConChem, another lining subcontractor. Mr. Fletcher also said he had less complaints and problems with the RM lining than with the Dudick lining. He kept daily diaries during construction of the FGD system at Pirkey from 1984 to 1987. In this diary, he noted numerous complaints about subcontractors. No complaints appear about the RM 8000 application. This absence of entry contrasts sharply with Mr. Fletcher's notations of problems with application of both the Dudick and ConChem linings.

### 2. *Mechanical Damage*

In March of 1985, Pirkey had its first lengthy outage since commercial operation and scrubber utilization. SWEPCO and UOP discovered that approximately 140 cubic yards, or 350 tons, of slurry comprised of calcium sulfate and sulfite, went through the mist eliminators into the outlet duct. This occurred when the demister trays of all four absorber towers had been removed. Material settled into the outlet duct, stack and inlet duct up to the ID fan blades. UOP noted that both the Dudick and RM linings "appeared" satisfactory. SWEPCO sent in six to eight laborers to remove the slurry with steel shovels. In doing this removal, the RM 8000 was damaged. The damage consisted of cuts through the lining to the steel substrate as well as other abrasions, scrapes and scratches to the material.

On September 24, 1985, UOP was notified of two leaks in the bottom of the outlet duct which were visible from the exterior. Mr. Fletcher located these leaks in an area where the lining had been damaged by shoveling or where stitch welding had occurred. Mr. Fletcher made an inspection at that time but does not recall that there were any other problems evident. He found damage in the form of scrapes, scratches, abrasions and imperfections in the coating. Mr. Fletcher stated that if a laborer was shoveling out 18 inches of slurry, it would be possible to nick the walls. The holes in the outlet duct substrate were large enough that liquid could drop out onto equipment underneath. These holes were patched with plywood covered with

silicon. RM repaired these problems and was paid by UOP. Mr. Fletcher conducted another inspection of the lining in December 1985 but did not note any further signs of deterioration.

### 3. *Failure*

In February of 1986, UOP notified RM that the RM 8000 had failed. At that time, Arne Melson of SWEPCO noted that there were holes in the floors, walls and ceilings where linings had been damaged by shovels. Mr. Melson noted that he could stick his finger through some of the holes in the coating. Tommy Slater, a mechanical engineer for SWEPCO, noted numerous holes in the floor, one hole in the ceiling and one hole in the wall. Mr. Slater noted that the lining had come off the wall in certain areas and had failed. Ray Neal, retired manager of construction at SWEPCO, noted failures in the outlet close to the absorber and high and low on the wall. He saw no other damage. Mr. Neal noted that there was more than one cause of what he saw, *e.g.*, mechanical damage and chemical attack.

Russell Huntley of RM inspected the RM 8000 lining at Pirkey Power Plant on February 12, 1986. At that time, the duct had been partially cleaned, although the majority of the duct had slurry on the ceiling, floor and sides. He noted that the broken pieces of slurry were very hard and not typical. Mr. Huntley noted that the outlet duct at Pirkey Power Plant was one of the worst environments he had ever seen in an FGD system. He had been in and observed approximately 20 systems throughout the country. Mr. Huntley noted that only 15 per cent of the lining showed degradation and that the other 85 per cent would have been fully usable. Mike Shelton of RM also estimated approximately 15 per cent to 20 per cent degradation of the lining. In addition, Doug Krause of UOP inspected the lining on February 10, 1986. He noted the following:

> Some scale on floor, probably from previous cleaning or dropped from walls. Lining generally looks good. There are a number of scattered holes in the floor at the exit from "A" absorber. Some may

be physical damage from previous cleaning. Also an area where stitch welding had been done outside the duct for half the duct width on the floor. Two areas at bottom corner angle are damaged on the south side.... Few pinholes were noted on north wall about eye level. Large bubble in roof of outlet section from "D" absorber and the top of one cross brace looks bad.

### 4. *Warranty*

The UOP–RM contract contained a warranty which provided that RM guaranteed "all equipment, materials, and workmanship performed by it against all defects and against failure under ordinary usage (linings are for an $SO_2$ scrubber on power boiler application), to fully comply with the requirements of the agreement for a period of one year after commercial operation, but no later than 1–1–86." The warranty further provided that RM would remedy or replace any lining which proved defective within this guarantee period, and that the replacement lining so furnished would be warranted against defects for a period of one year from the date of remedy or replacement. The warranty also provided for indemnity, should RM fail to remedy or replace any defective lining within a reasonable period of time after written notice.

Mr. Brock of RM noted that this warranty was unique because it warrants both manufacturing and application. Most companies use contractors to apply the lining; however, in this case, the warranty as to application came directly from the manufacturer. Mr. Lausten recalled that RM had offered UOP the opportunity to extend its warranty for two years for an extra $50,000. UOP declined this offer and, therefore, only purchased a one-year warranty.

■ In the power industry, a unit is in operation if just the boiler is working without the precipitator or the fans. Actual turbine startup began November 28, 1984,

with the setting of the boiler drum safety valve. The plant had serious problems and had to shut down the unit for turbine screen removal from December 19, 1984 to December 29, 1984. At that time SWEPCO also replaced the $SO_2$ ductwork expansion joints and acid washed the boiler. The generator was placed back on line December 31, 1984, and the unit was declared commercial at 5 minutes past midnight on January 3, 1985. This court finds that the system was in operation on January 3, 1985, and that this was the event which triggered RM's warranty.

■ To determine whether RM's warranty covered the damage discovered in February 1986, this court must first determine when the damage occurred and then, if within the warranty period, whether such damage was the result of ordinary conditions in a FGD outlet duct. It is clear that the lining did not fail upon application. As of November 1985, approximately a month and a half before the warranty expired, the only damage seen was caused by physical abuse. In December 1985, no damage was noted. Only in February 1986, over a month after the warranty expired, did UOP notice "massive" failures of the lining. This court finds that only 20 per cent of the lining had failed, certainly not enough to be characterized as "massive." This damage could easily have occurred after expiration of the warranty. Because this court finds that the failure did not occur within the warranty period, it need not determine whether the RM 8000 was subjected to extraordinary conditions.

### D. RM 8000 LT

#### 1. *Oral Contract*

Jerry Zucker,[4] owner of RM, received notice on February 26, 1986, that the RM 8000 had failed. Mr. Zucker spoke several times on the phone with John Morris, UOP's representative, and reached an agreement in principle that whoever was at fault for the failure of the lining would pay

---

**4.** Defendants denounce the value of Mr. Zucker's testimony, labeling him as a "self-appointed" expert in the industry. The court, however, recognized Mr. Zucker as an expert based on his

education and experience. His testimony was intelligent and helpful on both factual and technical matters.

for replacement. Based on this good faith agreement, Zucker instructed his employees to begin removing the RM 8000. Mr. Morris told Zucker at that time that any failure which occurred was within the warranty period.

RM and UOP personnel and principals met in Charleston, South Carolina, on March 7, 1986, to discuss the lining at Pirkey Power Plant. UOP representatives included John Morris, Antonio DoVale and Doug Krause. RM representatives included Jerry Zucker, Mike Shelton, John Halberda and Russell Huntley. Mr. Morris requested that the lining be removed and replaced, as the lining was not satisfactory for SWEPCO, the customer. In the interest of the customer, RM had already begun to replace the lining.

Mr. Zucker agreed to continue technical evaluation to understand the nature of the premature degradation, as he sensed a need for quick resolution of this issue. All of those present, except for John Morris, recall that an agreement was reached concerning payment for the replacement lining. RM would replace the lining and both sides would diligently investigate to determine the cause of the failure. Once a determination was made as to fault, RM would pay for any failure which occurred at the fault of the lining within the warranty period and any failure outside the warranty period or because of conditions outside of ordinary usage would be paid for by UOP. After Mr. Zucker reiterated this agreement, Zucker and Morris shook hands and stated, "It's a deal."

At the Charleston meeting, Zucker suggested to Morris that the RM 8000 LT would be a suitable replacement for the RM 8000. Zucker made this determination based on the information that he had at hand and knowing of a possible alkaline cyclicality and assurances that there were no high temperature problems in the outlet duct. The RM 8000 LT was more "forgiving" of pH cycling than the RM 8000. The RM 8000 LT is a vinylester material resistant to both acids and bases, but is temperature limited to 320 degrees fahrenheit. In a letter sent to UOP, RM stated that

RM's liability ... limited to the repair or replacement of the unsatisfactory products. Expenses incidental to the installation or removal of these products in the event of repair or replacement of same will not be borne by RM. No contingent liability is expressed or implied herein. Under no circumstance will RM's liability under this warranty exceed the original contract price.

This letter was sent to UOP after the Charleston meeting. The parties, however, did not discuss warranty of the replacement lining. The only indication that warranty was even considered is found in Mr. Shelton's note that the new lining would be warranted similar to that for the RM 8000.

Immediately after the meeting, Zucker, Huntley, Shelton and Halberda met to review what was discussed at the meeting. All agreed that the process of laying blame would drag on far too long and that some sort of offer should be made to UOP to settle the matter once and for all. Zucker then told Halberda to send a letter to Morris offering to drop the whole matter for a payment of "50 cents on the dollar" for replacement of the lining. UOP never accepted this offer.

RM began to investigate the failure of the lining and made several requests to UOP to provide information. RM sent samples of the expansion joints, made of the same material as the lining to DuPont and to General Engineering Laboratories. Both laboratories conducted tests upon the material and determined that failure was not a result of the type of acid attack expected in an outlet duct. Both laboratories also agreed that the appearance of the lining could have been caused by cyclical acid/caustic attack with caustic pH readings as high as 10. UOP never returned RM's calls on this matter, nor did UOP provide RM with any investigative findings of its own. In fact, UOP never began a serious investigation into the cause of the RM 8000's failure. UOP never provided any outside analysis to RM to either prove or disprove any theory of liability, even though the means to do so were peculiarly within UOP's control, i.e., the outlet duct.

Morris never responded to Zucker's or Halberda's letters concerning a request for data.

## 2. *Application*

Al Mersberg was RM's supervisor for the application of the RM 8000 LT. He photographed the outlet duct prior to applying the RM 8000 LT, showing that rusting occurred from the inside of the pipes to the outside where the lining was applied. He saw an indication of duct abuse on the floors and walls and indentations and scratch marks from the steel shovels.

Mr. Mersberg performed pH tests on the surface to determine cleanliness and checked the surface with a microscope. Temperature and dew point fluctuations plagued the subcontractors in their attempt to apply the RM 8000 LT. Furthermore, SWEPCO decided to move up the date for firing the boilers, and the subcontractors were forced to work 24–hour shifts in order to get the RM 8000 LT applied in time for it to cure.

In addition to weather problems, the subcontractors experienced mechanical problems. For instance, they had problems with the sandblasting equipment and with the spray equipment. They sandblasted with No. 1 and No. 2 sand, along with flintbrasive. They used a mixture of one flint to five bags, of #1 and #2 blend sand. They experienced continual problems with the blasting equipment and could not have two blasters operating at the same time. The spray units were inoperable for the first coat and the solution had to brushed onto the substrate.[5] Mr. Mersberg strove for a final profile of 40–mills and was successful.

Mr. Melson of UOP observed the RM 8000 LT application in March of 1986. UOP worked closely with RM, and SWEPCO looked on but did not get involved in quality control. The scrubber went back on line approximately nine days after the application was complete.

## 3. *Failure*

April 1986, Mr. Mersberg was notified of problems with the RM 8000 LT lining.

UOP personnel stated that there was "massive failure." Mr. Mersberg flew down on April 23, and discovered that only 90 square inches of the lining had failed. He indicated that after a normal application, approximately 3 to 5 per cent of the lining failure is maintainable and is usual. This small amount of failure was well below normal, considering that he had applied over 11,000 square feet of lining. RM repaired this damage even though it had not yet been paid for the lining.

UOP notified RM in September 1986 that the RM 8000 LT had completely failed and must be replaced. At that time, UOP had refused to pay for the RM 8000 LT or to provide RM with data supporting its position that RM was responsible for replacement. This refusal followed numerous requests for data and payment. RM refused to perform any work until UOP paid for the lining.

In November 1986, SWEPCO sandblasted the flooring and replaced the RM 8000 LT with a competitor's product. In May 1987, the remainder of the RM 8000 LT was removed and replaced with a competitor's product. Mr. Neal at SWEPCO stated that the RM 8000 LT performed poorly and had failed within a brief period of time. The failures that he observed in the fall of 1986 did not follow the earlier pattern of the RM 8000. He estimated there was approximately one failure per 100 square feet.

This court finds that the RM 8000 LT failed within the warranty period. This court must now determine why the lining failed. UOP asserts that the lining failed upon application. The facts support such an explanation as to the RM 8000 LT much more than for the RM 8000. Considerable evidence exists documenting problems with equipment and with application. Mr. Zucker testified that although initial profile was not important to ensure proper application of the RM 8000, it was essential for the RM 8000 LT. Sand was used to achieve initial profile. RM's own specifications require the use of flint. Dr. Koch testified that the

---

**5.** The RM 8000 LT can be applied either through brush, roll or spray.

proper profile is impossible to achieve with sand.

Unlike the RM 8000, the RM 8000 LT showed almost immediate signs of degradation. Only months after application, the RM 8000 LT experienced total failure. RM does not dispute that the lining failed, only the cause of failure. RM contends that the environmental conditions in the outlet duct were so extraordinary and outside the UOP–SWEPCO contractual specifications that the failure of the lining is not covered by the warranty.

Almost every witness acknowledged that the FGD system did not operate as intended until 1987. From the start, component parts of the system suffered serious and extraordinary malfunctions. Photographs introduced at trial depicted a system in total disarray. UOP would have this court believe that the major problems occurring upstream from the outlet duct had absolutely no effect on the environment in the outlet duct. This is simply unbelievable!

In February of 1986, the Pirkey Plant was "brought down" and the conditions of the component parts of the facility and their internals revealed additional uncorrected and continuing serious problems with the components of the FGD systems. For instance, the inlet duct had approximately 2″ to 3″ of sludge at its bottom and looked as if it were flooded by an overflow from a lower loop tank. All inlet dampers had scale buildup on their blades and did not seal. The expansion joint showed a rough texture, and the linings between the elbows of the piping were clearly cut and the piping corroded. Large pieces of the ConChem lining in the mixing chamber had continued to flake off the side and roof and the overall condition of that protective lining had become progressively worse. During this outage, a total of 40 keystone valves were defective and were shipped to the manufacturer for repair. A large number of the upper and lower mist eliminator nozzles and the four absorber vessels and the mist eliminator wash drains were plugged. UOP recognized that these conditions would result in continued carry-over.

All of these problems occurred prior to installation of the RM 8000 LT lining.

Nevertheless, the problems in the FGD system continued until approximately 1987. The Pirkey boiler and facilities went back on line on April 1, 1986, after the RM 8000 LT was applied. On April 3, 1986, the bypass dampers were leaking and the B and D outlet dampers were leaking through the packings. On April 4, 1986, 80 per cent of the upper loop nozzles in D Tower were plugged. On April 8, 1986, Pirkey reached 400 megawatts, but UOP was aware that the damper seals would be rendered ineffective. On April 9 and 10, 1986, Morris' diary entries note that the A Absorber outlet's seal air damper was leaking and B Absorber was overflowing "like crazy" into the inlet duct. During each day of April and May 1986, the components of the FGD system and their internal's parts continued to evidence problems. The megawatt output of the facility was limited to bring it within compliance with the permissible $SO_2$ emission from the stack into the atmosphere. Continuing problems after restart and application of the RM 8000 LT included mist eliminator and absorber scaling, nozzle pluggage, valve repairs and redesign, transformer relay outage and other serious problems in the ESP. An inspection of the Absorber A tower in June of 1986 revealed trap-out trays in unacceptable condition. The presaturator spray header in the Absorber A tower was pitted and the wet-dry interfaces were pitted. On July 1, 1986, the power feed transformer for ESP in the C Tower was out. This transformer fed ¼ of the cabinets, and on July 9, 1986, nine cabinets were out in ESP Tower A and 25 were out in ESP Tower B.

It was not until late summer of 1986 that the FGD system was capable of achieving the required $SO_2$ removal efficiency. This milestone, however, did not eliminate the scaling and plugging problems which continued at an unacceptable level until Spring of 1987 when the unit was finally able to sustain 720 megawatt output as guaranteed by UOP to SWEPCO. This guarantee was met only after the injection of sodium thiosulfate. The Pirkey facility never worked satisfactorily without this addition

of the sodium thiosulfate or other chemical, and even with this addition it was still not able to meet all of the contract guarantees between UOP and SWEPCO. The gases and fly ash reached the outlet duct in a relatively unchanged state because of lack of moisture in the absorber which protected those linings from failure. Once the gases reached the outlet duct, however, it met with moisture and attacked the outlet duct lining.

## II. CONCLUSIONS OF LAW

The parties agree that Texas law applies to the issues in this case. The contract is a Texas contract between parties who are neither residents of Texas, nor Louisiana. The contract was to be performed in Texas.

### A. Oral Contract

■ The Uniform Commercial Code, as enacted by the Texas legislature, applies to any contract for the sale of goods. A sale is defined as "the passing of title from the seller to the buyer for price." Tex.Bus. & Comm.Code § 2.106(a). Goods are defined generally to mean "all things (including specially manufactured goods) which are movable at the time of identification to the contract." Tex.Bus. & Comm.Code § 2.105(a). Clearly, the sale of the RM 8000 LT lining is a contract for sale of goods and, therefore, this transaction is covered by the Texas UCC.

■ The statute of frauds for the sale of goods appears in § 2.201. Under this section, any contract for the sale of goods for the price of $500 or more must be found in a writing "sufficient to indicate that a contract for sale has been made." There are three requirements for this memorandum: (1) it must evidence a contract for sale of goods; (2) it must be signed by party against whom enforcement is sought; and (3) it must specify a quantity. Section 2.201(c)(1), (2) and (3) all contemplate enforcement of certain oral contracts absent a writing. In each of these exceptions, a valid oral contract must be proved, plus something more. This "something more" is a special indicator that a contract, albeit oral, was, in fact, made. Nevertheless, beyond producing a memo or fitting within an exception to the requirement, a plaintiff must still persuade the trier of fact that the parties did make an oral contract with certain specific terms. *Perdue Farms, Inc. v. Motts, Inc.*, 459 F.Supp. 7 (N.D.Miss.1978).

■ The court finds that the parties entered into a valid oral contract at the March 7, 1986, meeting at Charleston, South Carolina. The parties agreed to investigate the cause and time of the RM 8000 failure. If the failure occurred outside the warranty period or if it was caused by extraordinary environmental conditions in the outlet duct, UOP would pay for the replacement lining. If the failure occurred within the warranty period and because of conditions existing under ordinary usage, RM would pay for the replacement lining. RM would immediately remove the RM 8000 and replace it with the RM 8000 LT. Because the failure of the RM 8000 occurred outside the warranty period, UOP must pay for the lining if this oral contract fits within an exception to the statute of frauds.

■ RM Engineering seeks to fit under exceptions (1) and (3). Tex.Bus. & Comm.Code § 2.201(c)(1) provides for enforcement if the "goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement." RM contends that not only did it make a "substantial beginning of their manufacture"; but that it actually installed the lining and the plant commenced operation long before it ever knew that UOP was unsatisfied. The lining does not qualify as a good that is "specially manufactured" for UOP and/or SWEPCO. As manufactured, it would have been marketable to another buyer. The only thing special about this product is that it was applied to the outlet duct and thereafter cannot be resold. The statute, however, requires the product to be specially *manu-*

*factured,* not merely unmarketable after sale.

Tex.Bus. & Comm.Code § 2.201(c)(3) expressly limits enforceability of an oral contract only to the apportionable part of goods that the buyer has received and accepted, or for which seller has received and accepted payment. UOP did not pay for the RM 8000 LT and, thus, the court must decide whether UOP "accepted" the lining.

Acceptance is determined in accordance with § 2.606. According to that section, acceptance of goods occurs in three situations:

1. After a reasonable opportunity to inspect the goods [buyer] signifies to the seller that the goods are conforming or that he will take and will retain them in spite of their nonconformity; or

2. [Buyer] fails to make an effective rejection, but such acceptance does not incur until buyer has had a reasonable opportunity to inspect them; or

3. [Buyer] does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

 The conduct referred to in subsection 3 need not "unequivocally refer" to the oral contract. Partial performance can be shown by receipt and acceptance of good notwithstanding other possible explanations of the conduct. White and Summers, *Uniform Commercial Code* § 2–5 p. 94 n. 30 (3d Ed.). RM seeks to show acceptance under subsections (2) and (3).

 Under the Code, acceptance is unrelated to passage of title; rather, its occurrence is more dependent upon the buyer's acquisition of control and opportunity to inspect. *Id.* at § 7–3, p. 335. Nevertheless, use of goods and ignorance of the defective nature of the goods is not "inconsistent" conduct under § 606(a)(3).

 One month after the application, UOP inspected the lining and notified RM of problems. RM repaired the damage, apparently to UOP's satisfaction. At that time, UOP had the opportunity to inspect

the lining, but did not reject the lining. The only conclusion is that UOP accepted the lining.

 Furthermore, this contract fits within the exception found in § 2.201(b). Section 2.201(b) relaxes the writing requirement between "merchants," providing that as between merchants "if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the [Statute of Frauds] against such party unless written notice of objection to its contents is given within ten days after it is received." A "merchant" is any person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill. Tex.Bus. & Comm.Code § 2.104(a). Under this definition, it appears that UOP, SWEPCO and RM are all merchants. RM manufactures this type of product. UOP designs FGD systems and thus has the knowledge or skill peculiar to these type of goods. SWEPCO hired Sargent & Lundy as engineers who, by its occupation, holds itself out as having such knowledge or skill. A contract between merchants means any transaction in which both parties are chargeable with the knowledge or skill of merchants. Tex.Bus. & Comm.Code § 2.104(c). All parties in this contract are merchants.

 On March 7, 1986, Mr. Halberda sent Mr. Morris a letter offering to modify the "original contract" price for payment of 50 per cent by May 5, 1986. On April 4, 1986, RM sent UOP an invoice for "50% of [UOP] original contract cost of $352,788 ... for coating replacement." At the bottom of the invoice, RM made clear that this document was an offer to modify an al-

ready existing contract.[6] Mr. Morris responded to RM's letter by stating that RM had not justified payment as failure was covered by the warranty. This response does not deny the existence of the contract, but fits within the express terms of it as found by this court. UOP was asserting that the RM 8000 failed within the warranty period. This court disagrees. The contract fits within an exception to the statute of frauds and is thus enforceable.

**B. Indemnity**

 UOP claims that even if the contract is enforceable, RM owes UOP for replacement of the failed RM 8000 LT lining. This lining failed within the warranty period.

Nevertheless, if the lining failed not because of application problems but because of severe problems with the FGD system which did not fall within ordinary usage, then RM is not required to indemnify UOP for replacement of the lining. The court notes that this indemnity claim is a counterclaim upon which UOP has the burden of proof. The court is unconvinced that the severe problems of the FGD system and the catastrophic nature of the conditions within the absorber towers, inlet and outlet ducts, can fall within ordinary usage. Therefore, even if the RM 8000 LT is covered by the original warranty and not by the additional warranty sent by RM to UOP after the March 1987 contract, this court determines that RM is not responsible for replacement of the RM 8000 LT.

**C. Motion To Amend**

 RM seeks to amend its complaint to add a claim for attorney's fees. Texas law allows for attorney's fees when the claim is for breach of an oral or written contract. Tex.Civ.Pract. & Rem.Code § 38.001.

The function of Fed.R.Civ.P. 15(a) is to enable a party to assert matters that were overlooked or unknown at the time the party interposed the original complaint or answer. RM did not seek to amend until

---

**6.** The document reads:
 Price herein invoiced is effective through May 5, 1986, and may be withdrawn at any time hereafter at the sole option of RM ... by written

after it had finished its case-in-chief. Nevertheless, RM knew that Texas law governed the contract claim long before trial began. This amendment would greatly increase the amount owed by UOP and would necessitate further discovery.

This court believes that justice and fairness mandate the DENIAL of RM's motion.

**III. CONCLUSION**

This court finds that there existed an oral contract between RM Engineering and UOP concerning replacement of the RM 8000. Because the RM 8000 failed outside of the warranty period, UOP must pay RM for installation of the RM 8000 LT. The RM 8000 LT was subject to conditions not contemplated within ordinary usage and, therefore, even though the lining failed within the warranty period, RM is not responsible for its replacement.

RM is ORDERED to prepare a judgment consistent with this memorandum ruling and submit it to the court.

notice to [UOP] unless full payment of amount invoiced is received by seller on or before May 5, 1986.