**WEBCOR PACKAGING CORPORATION, a Michigan corporation, Plaintiff–Appellant,**

**v.**

**AUTOZONE, INC., a Nevada corporation, Defendant–Appellee.**

No. 96–2106.

United States Court of Appeals, Sixth Circuit.·

Argued July 29, 1997.

Decided Sept. 23, 1998.

Peter T. Mooney (argued and briefed), Sander H. Simen (briefed), Simen, Figura & Parker, Flint, MI, for Plaintiff–Appellant.

F. Robert Schmelzer (argued), Christopher A. Hajek (briefed), Gault, Davison, Bowers, Hill, Parker & McAra, Flint, MI, for Defendant–Appellee.

Before: JONES, NELSON, and RYAN, Circuit Judges.

JONES, J., delivered the opinion of the court, in which NELSON, J., joined. RYAN, J. (p. 361), delivered a separate concurring opinion.

### OPINION

NATHANIEL R. JONES, Circuit Judge.

The parties in this case have framed the issue as one of first impression: whether the "ultimate purchaser" of unique goods may be considered as the buyer for purposes of the specially manufactured goods exception to

the statute of frauds. We conclude that the district court was correct in its reliance upon the circumstances of manufacture. In doing so, we take this opportunity to refine and extend the analysis of the district court.

## I.

We recite the undisputed facts of this case relying heavily upon the background summary provided by the district court.

Autozone, Inc. (Autozone), the defendant in this matter, retails aftermarket automotive parts and supplies under its own brand name in more than 1,000 stores throughout the United States. Autozone does business by purchasing "retail ready" aftermarket automotive parts from a constantly changing number of manufacturers and suppliers (the "Autozone venders"). When sold by the Autozone vendor to Autozone, a "retail ready" part is pre-packaged and ready to be placed on the shelf for consumer sale from Autozone's outlets.

Plaintiff, Webcor Packaging Corporation (Webcor), manufactures and sells commercial packaging. For several years it contracted with the Autozone vendors to manufacture packaging for parts retailed by Autozone under the trade name "Duralast." Autozone frequently directed its vendors to Webcor as a possible manufacturer of "Duralast" cartons; however, the referral implied no obligation to purchase from Webcor. The art work and other specifications for the "Duralast" brake parts packaging were provided to Webcor by Autozone.

Prior to 1991, Webcor maintained a 30 day supply of "Duralast" cartons to meet vendor demand. Although Autozone never directly contracted with Webcor for exclusive manufacture and sale of "Duralast" cartons, it occasionally purchased the packaging for its own use by purchase order.

By late 1990, Autozone had experienced tremendous growth as consumer demand for its products increased. During that same year, Webcor received unusually large requests for "Duralast" cartons from Autozone vendors, depleting Webcor's 30 day inventory. In November 1991, Joel Liggett, a Webcor sales representative, telephoned Auto-

zone brake parts purchasing manager Joe Turman and explained that Webcor's inventory of "Duralast" packaging would have to be increased to a 60 day supply in order to satisfy vendor demand. Mr. Liggett claims that he requested and obtained assurances from Mr. Turman that Autozone would "cover" payment for the 60 day inventory in the event it became obsolete. However, there is no signed writing between the parties to such effect.

Mr. Turman's recollection directly contradicts that of Mr. Liggett. Mr. Turman recalls no telephone conversation with Mr. Liggett in which the parties agreed that Autozone would guarantee a 60 day inventory of "Duralast" cartons manufactured by Webcor. Mr. Turman further testified that he would have had no authority to enter into an agreement with Webcor as described.

In July 1993, David Wilhite, Turman's successor at Autozone, instructed Webcor to stop manufacturing "Duralast" packaging, as Autozone had decided to change to a new brand name and symbol. Subsequent to this instruction, Webcor managed to sell a portion of its remaining "Duralast" inventory. The remainder of the obsolete inventory, the interest on financing its manufacture, as well as the cost of warehousing it, comprise damages of $101,736.12 claimed by Webcor.

During the one day bench trial, held on March 12, 1996, John Maher, a vice-president of Webcor, testified that at a meeting on April 6, 1994, Mr. Wilhite "reaffirmed" the parties' November 1991 oral agreement by promising to cut a check for Webcor's outstanding "Duralast" inventory. Mr. Wilhite denied this allegation at trial, stating that he had no recollection of such an oral agreement, that he did not offer to make the alleged payment to Webcor and that he would not have had authority to do so.

The district court, in its findings of fact, concluded that the November 1991 phone conversation did take place and that Mr. Liggett did state "that a 60 day inventory would result in better service to the vendors." Further, the district court found that the "only writing memorializing this conversation was an in-house memo signed by Joel

Liggett stating 'Per Joe Turman at Autozone, he will cover a 2 month inventory.' " Finding that no signed written agreement had been made, the district court engaged in what it termed a "straightforward" analysis of the specially manufactured goods exception to the statute of frauds, concluding that the exception "contemplates [that] there may be only a single buyer[.]" Thus, given the multiple purchasers involved, the district court concluded that the "Duralast" cartons were not specially made for Autozone and that the statute of frauds precluded enforcement of the alleged oral agreement.

Webcor filed this timely appeal.

## II.

### A.

The district court interpreted the Michigan specially manufactured goods exception under Michigan Compiled Laws § 440.2201(3)(a). We therefore review the district court judgment *de novo. United States v. Brown,* 915 F.2d 219, 223 (6th Cir. 1990); *Waxman v. Luna,* 881 F.2d 237, 240 (6th Cir.1989). Under the Michigan statute of frauds, a contract for the sale of goods priced over five hundred dollars must be in writing as a general matter.[1] Mich. Comp. Laws § 440.2201(1). However, where a manufacturer produces special goods for a buyer, courts may permit evidence of the oral agreement at trial:

> [I]f the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement.

Mich Comp. Laws § 440.2201(3)(a). The long-accepted justification for this statutory rule lies in the assurance that, by virtue of

the unique nature of the goods, the manufacturer would not have produced such unique goods absent an agreement with the alleged buyer. "[T]he modern justification for the exception often stresses the need to protect the special manufacturer against the peculiar vulnerability that attends his station. He is more seriously injured than other sellers when a buyer successfully reneges on an oral contract, because the special manufacturer is then left with goods that, by definition, are not readily resalable to others." WILLIAM D. HAWKLAND, UNIFORM COMMERCIAL CODE SERIES § 2–201:03 (1984). It is worth emphasizing that the statute of frauds is a rule of evidence. Thus, upon favorable judgment, a proponent-party—one seeking to invoke the exception—may attempt to prove the validity of the alleged oral agreement. *Cf. RM Engineered Products, Inc. v. UOP, Inc.,* 793 F.Supp. 1373, 1384 (W.D.La.1991) (citing *Perdue Farms, Inc. v. Motts, Inc.,* 459 F.Supp. 7 (N.D.Miss.1978)).

### B.

Courts generally use a four-part standard to determine whether the specially manufactured goods exception applies in a given case. Under that formulation, the circumstances of manufacture must manifest the following:

1) the goods must be specially made for the buyer;

2) the goods must be unsuitable for sale to others in the ordinary course of the seller's business;

3) the seller must have substantially begun to have manufactured the goods or to have a commitment for their procurement; and

4) the manufacture or commitment must have been commenced under circumstances reasonably indicating that the goods are for the buyer and prior to the seller's receipt of notification of contractual repudiation

*Colorado Carpet Installation, Inc. v. Palermo,* 668 P.2d 1384, 1389 (Colo.1983); *see also,*

---

1. Mich. Comp. Laws § 440.2201(1) provides in pertinent part:

    (1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500.00 or more is not enforceable by

way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought. . . .

*RM Engineered Products, Inc.*, 793 F.Supp. at 1384; *Ivey's Plumbing & Electric Co., Inc. v. Petrochem Maintenance, Inc.*, 463 F.Supp. 543, 550 n. 2 (N.D.Miss.1978); *Contours, Inc. v. Lee*, 10 Haw.App. 368, 874 P.2d 1100, 1104–05 (1994).

In determining whether goods are specially manufactured, courts have traditionally looked to the goods themselves. "The term 'specially manufactured,' therefore, refers to the nature of the particular goods in question and not to whether the goods were made in an unusual, as opposed to the regular, business operation or manufacturing process of the seller." *Impossible Electronic Techniques, Inc. v. Wackenhut Protective Systems, Inc.*, 669 F.2d 1026, 1037 (5th Cir.1982); *see also RM Engineered Products, Inc.*, 793 F.Supp. at 1384–85; *Contours v. Lee*, 874 P.2d at 1105. Thus, under circumstances where two parties dispute the existence of an oral agreement, the proponent must convince the court that the goods themselves have some feature that makes the product marketable only to the buyer. Where the goods have such unique traits, courts are allowed to permit parol evidence as to the existence of the alleged agreement. The district court in this case reached an impasse as it attempted to identify the buyer, "uncover[ing] no case interpreting the phrase [for the buyer]." In the end, the district court based its decision on two independent grounds. First, it found that the specially manufactured goods exception "contemplates that there may be only a single buyer for the [ ] exception to apply." Second, the district court concluded, the fact that "Webcor sold 'Duralast' packaging to multiple buyers" made the exception inapplicable. Given the facts of this case, we conclude that the reliance of the district court upon the existence of multiple purchasers provided a sound basis for its decision. However, we take note of the significant wrinkle presented in this case—a series of three-layered transactions involving multiple parties—as it impacts the traditional "look to the goods" rule in determining the buyer.

The latent shortcoming of the traditional test, as evidenced by the present case, is that the first and second prong of the *Colorado Carpet* test form a somewhat circular meaning in the case law. On the one hand, goods are deemed "specially manufactured" when no other buyer would reasonably purchase the goods. "It is a reasonable assumption, for example, that a seller will not make or procure goods not suitable for sale to others in the normal course of the seller's business unless a purchaser has contracted with the seller to purchase these goods. Denying enforcement of the contract under such circumstances can result in unfairness to the seller by encumbering him with unsalable goods." *Colorado Carpet*, 668 P.2d at 1390 (citing *Impossible Electronic Techniques, Inc. v. Wackenhut Protective Systems, Inc.*, 669 F.2d 1026 (5th Cir.1982); 3 R. Duesenberg & L. King, BENDER'S UNIFORM COMMERCIAL CODE SERVICE § 2.02[4] at 2–30). On the other hand, the buyer is deemed the party for whom the otherwise unsalable goods have been produced. Specially manufactured goods are therefore necessarily goods unsuitable for sale to others in the ordinary course of the seller's business. "Before the seller can invoke the special manufacturing exemption from the statute of frauds, he must prove that the goods are specially manufactured for the buyer. Section 2–201(3)(a) [of the Uniform Commercial Code] relates to these two matters by defining 'specially manufactured' goods as those that are not readily resalable to anyone other than the buyer. In addition, however, the exception requires the presence of 'circumstances which reasonably indicate that the goods are for the buyer.' " Hawkland, *supra; Colorado Carpet Installation*, 668 P.2d at 1390 (Colo.1983) ("The term 'specially manufactured' refers to the character of the goods as specially manufactured *for a particular buyer,* and not to whether they were 'specially made' in the usual course of the seller's business."). This plain but somewhat tautological construction of the phrase "specially manufactured for the buyer" persists in the case law. *See Contours,* 874 P.2d at 1105 (mandating that the trial court on remand apply the *Impossible Electronic Techniques* "crucial inquiry" of whether manufacturer could sell goods in the ordinary course of business to someone other than the original buyer to determine if the goods at issue were specially manufactured); *Smith–Scharff Paper Co. v. P.N. Hirsch &*

*Co. Stores, Inc.,* 754 S.W.2d 928, 930–31 (Mo. Ct.App.1988) (finding that bags made especially for and stamped with the name of customer were not suitable for sale to others in the ordinary course of business and consequently no written contract for the transaction was required under the statute of frauds); *E.G. E.G. Young Lumber Co.v. New York Bondstone Corp.,* 15 Misc.2d 985, 179 N.Y.S.2d 45, 49 (N.Y.Sup. 1958) (finding that lower court placed undue significance · on "manufactured" language and thus holding that an intermediate seller of specially manufactured goods could assert the exception to evidence an oral contract where the intermediate seller ordered special goods from the manufacturer).

The leading specially manufactured goods case, *Impossible Electronic Techniques, Inc. v. Wackenhut Protective Systems, Inc.,* 669 F.2d 1026 (5th Cir.1982), provides a classic example of the circular treatment of the exception in the case law. In that case, George Wackenhut, chairman of the Wackenhut Company, the parent company of Wackenhut Protective Systems, Inc. (WPS), the defendant in the case, purchased a new security system for his home through a local retailer and installer of security equipment, Jackson & Church Electronics, Inc. *Impossible Electronic Techniques. Inc.,* 669 F.2d at 1029. Prior to the purchase, WPS solicited several closed circuit television camera security system manufacturers at the behest of Mr. Wackenhut. *Id.* Two companies were invited to demonstrate their wares to Mr. Wackenhut, who personally interviewed each and selected the security system manufactured by Impossible Electronic Techniques, Inc. (IET). *Id.* Since the closed circuit television cameras required installation, IET suggested that Mr. Wackenhut purchase the security system through Jackson and Church Electronics, Inc. *Id.* Subsequently, IET initiated communications with Jackson and Church, providing the latter with shipping instructions for the first camera. *Id.* Jackson and Church sent a follow-up letter explaining the payment arrangement and thanking IET for the referral. *Id.* Jackson and Church also received a purchase order from WPS requesting the IET security system. *Id.* Jackson and Church later sent a purchase order to IET to initiate manufacture of the camera. *Id.*

IET manufactured the first camera, which Jackson and Church installed in June 1974. *Id.* Jesse Wagner, president of IET, personally observed the installation of the first camera. *Id.* At the time of installation, Wagner disclosed to Mr. Wackenhut that the picture tube of the newly installed camera had an operational life expectancy of six months. *Id.* at 1030. Mr. Wackenhut balked. One week later, WPS sent Jackson and Church a letter canceling its earlier purchase order and requesting a less expensive camera system. *Id.* In turn, Jackson and Church canceled its order with IET. *Id.*

At trial, IET argued that Mr. Wackenhut had entered into an oral agreement during the initial meeting in which he selected the IET closed-circuit system. *Id.* Wackenhut asserted that the Florida statute of frauds precluded enforcement of the alleged oral agreement. *Id.* IET then sought to invoke the specially manufactured goods exception.

The district court granted summary judgment to the defendants, finding that the statute of frauds prevented the alleged oral agreement from being deemed admissible at trial. Reversing the district court decision, the Fifth Circuit provided some insight into the question before this court when it observed: "The crucial inquiry is whether the manufacturer could sell the goods in the ordinary course of his business to someone other than the original buyer. If with slight alterations the goods could be so sold, then they are not specially manufactured; if, however, essential changes are necessary to render the goods marketable by the seller to others, then the exception does apply." *Id.* at 1037. The *Impossible Electronic Techniques* court answered the inquiry by finding that the cameras at issue had been specially made for Wackenhut, because the cameras had been specially created to automatically adjust to the extreme nighttime darkness and daytime sunlight reflecting off the beach and sea near the Wackenhut home. Thus, the court found that the unique relationship between the goods and the alleged buyer was

sufficient to permit evidence of an oral agreement. *Id.*

In the present case, the application of the "look to the goods rule" presents the following problem. There is no question that the "Duralast" logo and coloring affixed to the cartons at issue conform to the packaging used by Autozone, the only retailer in the business of selling "Duralast" brake parts. Thus, in looking to the goods, this court might well have concluded that the rule favors Webcor.[2] However, it is also true that numerous purchasers—the Autozone vendors—had an interest in purchasing the "Duralast" cartons to fulfill their obligations to provide packaged brake parts to Autozone. Even though those Autozone vendors purchased the cartons with intentions to sell them to Autozone, their very presence complicates the question of whether Autozone can be implicated as the buyer in this case.

Were our consideration solely limited to identifying the buyer under the exception, we might address this conundrum in two distinct ways. First, we might conclude that, notwithstanding the intermediate purchasers, the "Duralast" cartons were made especially for Autozone under the "ultimate purchaser" theory advanced by Webcor. Under that theory, intermediate purchasers are incidental to the inquiry. If the court "looks to the goods" and can determine that the goods have been made for a single downstream purchaser, the argument goes, that single purchaser is vulnerable under the specially

manufactured goods exception. If this court took such a position, Autozone might well be found to be the buyer for purposes of the exception.[3]

In the alternative, we might adopt the district court's "single buyer" theory, which places a premium on a direct and singular economic relationship between the parties. Under this view, a court limits the applicability of the exception to instances in which no other purchasers of the unique goods could reasonably be expected to purchase the goods absent major alterations. However, this theory carries the significant disadvantage of being overly rigid in a world of increasingly complex business transactions.[4]

Although we leave the debate about which approach would prevail in cases where the "look to the goods" rule fails to provide a ready answer for another day, we implore courts to maintain the simplicity of the traditional rule—look to the goods themselves and make a determination of fact and law. As the *Colorado Carpet* formulation makes clear, identifying the buyer is not the sole issue in deciding whether to apply the specially manufactured goods exception. *See Colorado Carpet,* 668 P.2d at 1389.

■ In plain truth, the specially manufactured goods exception demands that we also consider factors other than the identity of the buyer. Although the parties attempt to confine the issue of whether the exception applies in this case to the identity of the buyer,

---

2. Indeed, Hawkland suggests that the plaintiff need only demonstrate a minimal relationship between the goods and the alleged buyer to justify a finding in its favor:

   "The fact that the seller has on hand goods that are particularly suitable for the buyer (for example, goods on which the buyer's name has been engraved, or a machine that only the buyer's factory can use) does not necessarily prove that the buyer ordered them. Apparently, however, *any indication in the goods themselves that they are for the buyer and are not suitable for sale to others* is enough to satisfy section 2–201(3)(a), even where the buyer denies making the contract." HAWKLAND. *supra* (italics added).

3. The effect of such finding, however, would not automatically trigger reversal of the disposition below, because, as will be seen, the district court made an apparent determination that the presence of multiple intermediate purchasers served

as a basis for finding the specially manufactured goods exception inapplicable here.

4. It would seem that, had Webcor sued the intermediaries, the single buyer theory would have operated to exclude all Autozone vendors as well, since there were numerous such vendors. In most instances, the single buyer rule operates in a manner consistent with the policy reasons supporting the exception. However, the rule seems to fail where a class of purchasers interested in the same unique goods prevails upon a manufacturer to produce such goods. We are assured by virtue of the goods themselves that they were produced for the benefit of a single downstream buyer. We are mindful, however, that the goods could have been sold by Webcor to any number of parties. The facts of the present case split the policy of the exception.

the district court opinion went further than that and noted an independent basis for non-application of the exception. Were we to assume, for the sake of argument, that the district court erred in its determination of the buyer, the court still found that "the manufacture [had not been] commenced under circumstances reasonably indicating that the goods are for the buyer," when it stated in clear fashion that, "[b]ecause Webcor sold 'Duralast' packaging to multiple buyers, the 'specially manufactured' exception to the UCC's statute of frauds is not applicable to the facts before the court." *See Colorado Carpet*, 668 P.2d at 1389. This determination operates as a separate basis upon which to affirm.

In reviewing this determination, we adopt an analysis that looks to several factors: (1) the course of dealings between the parties; (2) the flow of the allegedly specially manufactured goods; (3) the essence of goods to be received by the alleged buyer; and (4) the duty to compensate the manufacturer undertaken by or the existence of any right of repudiation of the alleged buyer.

### C.

■ Applying those factors to the instant case, we find that the "Duralast" cartons were not specially manufactured for Autozone. The course of dealings between the parties indicates that Webcor had long engaged in transactions with Autozone vendors and only rarely sold "Duralast" cartons directly to Autozone itself. The ongoing communications between Webcor and Autozone took place to the mutual benefit of both parties. Autozone reduced the risk of error in the manufacture of its cartons by referring its vendors to Webcor, a manufacturer experienced in the production of the "Duralast" cartons, while Webcor satisfied its direct clientele. Moreover, the referrals by Autozone were communicated directly to its vendors and implied no obligation on the part of those vendors to purchase the cartons from Webcor. Thus, the course of dealings indicates that Webcor formed agreements with many intermediate vendors and its usual contacts with Autozone only supplemented those agreements. Further, the alleged oral contract in which Autozone is claimed to have agreed to cover the increased supply of the cartons is consistent with Webcor's desire to supply such goods to the intermediaries. Therefore, the course of dealings factor weighs in favor of Autozone.

With regard to the second factor, there is no question that the "Duralast" cartons at issue in this case were manufactured for sale to the Autozone vendors (for later sale to Autozone). Therefore the cartons at issue would have flowed from Webcor to the Autozone vendors and only then to Autozone. The passage of the cartons through sale to Autozone vendors diminishes our usual assurance that production of special goods can be linked to the alleged buyer. *See Impossible Electronic Techniques, Inc.*, 669 F.2d at 1036–37.

The essential goods to be received by Autozone under the arrangements existing at the time of the alleged oral agreement were finished brake parts, not empty "Duralast" cartons. While the cartons were part of the finished product, they did not, as a matter of course, comprise the complete purchase.

Finally, there has been no suggestion that Autozone had any duty to compensate Webcor for its production of "Duralast" cartons or any right to preempt production of the cartons on its own. Although Autozone did contact Webcor directly to convey that it planned to discontinue the "Duralast" line, this communication does not itself prove that such a duty prevailed upon Autozone.

Given that the four factors weigh in favor of Autozone, we conclude that the circumstances of manufacture of the "Duralast" cartons were so attenuated that the specially manufactured goods exception should not apply.

### III.

Although the parties present the ultimate question in this case as a matter identifying the buyer, we conclude that the circumstances of manufacture do not manifest that the "Duralast" cartons were produced for Autozone. Accordingly, we **AFFIRM**.

RYAN, Circuit judge, concurring.

I concur in the judgment of affirmance.