**CONTOURS, INC.,** a Hawai'i corporation, Plaintiff–Appellee, v. **WILLIAM LEE**, Defendant–Appellant

NO. 16716

(CIV. NO. 91–0425)

JUNE 8, 1994

BURNS, C.J., HEEN, AND CIRCUIT JUDGE ACOBA,* IN PLACE OF WATANABE, J., RECUSED

---

* At the time of assignment as substitute judge, Judge Acoba was a circuit court judge. He has since been sworn in as an Associate Judge of the Intermediate Court of Appeals.

OPINION OF THE COURT BY BURNS, C.J.

Defendant William Lee (Lee) appeals the circuit court's December 21, 1992 Judgment (Judgment) in favor of plaintiff Contours, Inc. (Contours) and against Lee in the amount of $8,500, plus interest at ten percent per annum from December 12, 1990 until paid, plus $310.90

costs and $837.50 attorney's fees. We vacate the Judgment and remand for further proceedings consistent with this opinion.

## FACTS

David DiGrandi (DiGrandi) is Contours' president and a furniture maker. The circuit court's November 13, 1992 Findings of Fact and Conclusions of Law (FsOF and CsOL) state in relevant part as follows:

### FINDINGS OF FACT

3. Prior to November 12, 1990, [Lee] planned two (2) parties for his employees and business/social guests to be held at his recently purchased home on or about December 8 and December 15, 1990. [Lee] wanted his dining room area to be furnished appropriately for these events.

\* \* \*

5. At the November 12 meeting, DIGRANDI and [Lee] entered into an agreement for [Contours] to design, construct, and deliver certain pieces of furniture on or before December 5, 1990. The terms of the agreement were handwritten and signed by DIGRANDI. . . .

6. [Contours] and [Lee] agreed that [Contours] would construct and deliver: two (2) "Avonite–Maple Tables"; two (2) "Maple–Fabric Arm Chairs"; twelve (12) "Maple–Fabric Side Chairs"; one (1) "Maple–Avonite–Glass Wall Unit" measuring 12 feet in length; one (1) "Maple–Avonite Dry Bar"; and one (1) "Lacquer Bookcase Unit," for a total purchase price of $18,000.00 (in cash), including a $3,000.00

deposit. [Lee] paid [Contours] the $3,000.00 deposit in cash on November 12, 1990 and made no further payments to [Contours] thereafter.

7. [Lee] wanted the furniture to be delivered in time to be used at his two (2) parties in December 1990. Therefore, the parties agreed that if [Contours] failed to deliver the furniture to [Lee] on or prior to December 5, 1990, [Contours] would pay [Lee] $500.00 for each day delivery was delayed. . . .

8. . . . It was the understanding of the parties that DIGRANDI would be responsible for the design of the furniture in consultation with [Lee]. DIGRANDI sketched drawings of the wall unit and chairs . . . , however, [Lee] directed DIGRANDI as to the design of the dining room tables.

9. About one (1) week after the November 12, 1990 meeting, the parties agreed on the design of the furniture.

10. About two (2) weeks after the November 12, 1990 meeting, [Lee] orally canceled his order for the dry bar and bookcase, which would have cost about $3,000.00. [Contours] did not construct or deliver the canceled items.

11. During the construction period, [Lee] requested changes to the dining room tables and chairs, and [Contours] complied with [Lee's] request.

12. During the construction period, DIGRANDI suggested, and [Lee] agreed, to reduce the length of the wall unit.

* * *

14. [Contours] did not meet the December 5, 1990 delivery deadline.

15. The dining room tables, chairs, and part of the wall unit were delivered to [Lee] on December 12, 1990, and the remaining part of the wall unit was delivered to [Lee] on or about December 14, 1990.

16. Although the finishing work on the dining room tables was not completed on December 12, 1990, the tables were delivered to [Lee] at his request with the understanding [Contours] would pick up the tables later to take them back to [Contour's] shop for finishing.

17. On one (1) occasion [Contours] tried to pick up the furniture to do further finishing work. On another occasion [Contours] tried to take back the furniture by sending a commercial delivery service to pick up the furniture. On both occasions [Lee] refused to surrender the furniture.

18. Since the delivery of the furniture to [Lee], [Lee] has retained the furniture and has not permitted [Contours] to take the furniture back or complete the finishing work.

19. Except for about a seven (7) month period during which the furniture remained in a home owned by [Lee] (which was not [Lee's] residence), since December 1990 the furniture has been stored on [Lee's] partially covered patio, which was exposed to weather conditions.

## CONCLUSIONS OF LAW

\* \* \*

4. About two (2) weeks after November 12, 1990, [Lee] canceled his order for two (2) items

(i.e. the dry bar and bookcase) thereby reducing the purchase price by $3,000, and agreed to reduce the length of the wall unit.

5. [Contours] has substantially performed its obligations under the agreement, as modified by agreement of the parties, except insofar as [Contours] did not meet the delivery deadline.

6. [Lee] received, accepted, and retained the goods, and has not permitted [Contours] to take back the goods or to complete finishing work on the goods. [Lee] has not complied with his obligation under the agreement to pay the purchase price for the goods received.

7. [Contours] is entitled to recover the sum of $12,000.00, which is the difference between the purchase price of $18,000.00 and $6,000.00 (the sum of the price for the cancelled items, ($3,000.00) and the deposit paid by [Lee] ($3,000.00)).

8. [Lee] is entitled to recover the sum of $3,500.00 for [Contour's] delay in delivering the goods ($500.00 per day from December 6, 1990 through December 12, 1990).

9. Judgment shall be entered in favor of [Contours] and against [Lee] for the amount of $12,000.00, and judgment shall be entered in favor of [Lee] and against [Contours] for the amount of $3,500.00.

\* \* \*

## DISCUSSION

Lee raises various points on appeal. We will discuss only those that merit discussion.

## I.

Lee's version of the facts was that: he did not orally modify the contract; Contours breached the contract by not delivering some of the goods and delivering the balance of the goods nonconforming and late; Lee did not accept the delivered goods; Lee told Contours' employees to depart his residence and to take the goods with them; after Contours' employees departed without taking the goods, Lee held the goods as security for the refund of his $3,000 down payment; and the goods were not damaged while Lee held them. Consequently, Lee disputes FsOF 10, 11, 12, 15, 16, 17, 18, and 19, and CsOL 4, 5, 6, 7, 8, and 9.

The trial judge, however, did not believe Lee. The first issue on appeal is whether any of the challenged FsOF are clearly erroneous. *See Shoemaker v. Takai*, 57 Haw. 599, 561 P.2d 1286 (1977). Upon a review of the record, we conclude that none of the challenged FsOF are clearly erroneous because (1) each is supported by substantial evidence in the record and (2) we do not have a definite and firm conviction that a mistake has been made.

## II.

The original contract was in writing. The subsequent oral modification of the contract canceling the order of some goods and changing the order for the remaining goods cannot be enforced against Lee absent an exception to the relevant statute of frauds. Thus, the question is whether the circuit court was right when it implicitly concluded that the oral modifications of the written contract (FsOF 10, 11, and 12) were enforceable. In the absence of an essential finding of fact, we cannot answer this question.

Hawai'i's Uniform Commercial Code, Hawai'i Revised Statutes (HRS) chapter 490 (1985), states in relevant part as follows:

**§ 490:2–201  Formal requirements; statute of frauds.** (1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. . . .

\* \* \*

(3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable

(a) If the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement; or

\* \* \*

**§ 490:2–209  Modification, rescission and waiver. . . .**

(3)  The requirements of the statute of frauds section of this Article (section 490:2–201) must be satisfied if the contract as modified is within its provisions.

\* \* \*

The five requirements specified in HRS § 490:2–201(3)(a) to qualify for the "specially manufactured goods" exception to HRS § 490:2–201's statute of frauds are:

(1) the goods are to be specially manufactured for the buyer;

(2) the goods are not suitable for sale to others in the ordinary course of the seller's business;

(3) the seller made either a substantial beginning of the manufacture of the goods or commitments for their procurement;

(4) the seller's beginnings or commitments occurred under circumstances which reasonably indicate the goods are for the buyer; and

(5) the seller's beginnings or commitments occurred before the seller received a notice of repudiation from the buyer.

As used in HRS § 490:2–201(3)(a), the term "specially manufactured,"

> refers to the nature of the particular goods in question and not to whether the goods were made in an unusual, as opposed to the regular, business operation or manufacturing process of the seller. That the seller may be in the business of manufacturing custom designed and made goods does not necessarily preclude his goods from being deemed "specially manufactured" within the meaning of this exception. The crucial inquiry is whether the manufacturer could sell the goods in the ordinary course of his business to someone other than the original buyer. If with slight alterations the goods could be so sold, then they are not specially manufactured; if, however, essential changes are neces-

sary to render the goods marketable by the seller to others, then the exception does apply.

*Impossible Elec. Techniques, Inc. v. Wackenhut Protective Systems, Inc.,* 669 F.2d 1026, 1037 (5th Cir. 1982).

As noted in FsOF 10, 11, and 12, this case presents the situation where the contract was orally modified by canceling the order for some of the goods and changing the order for the remaining goods. We conclude that HRS § 490:2–201(3)'s specially manufactured goods exception applies to the orally modified contract if the seller and the remaining goods described in the orally modified contract satisfy the five requirements. As noted by Professor Holland, HRS § 490:2–201(3)'s

> specially manufactured goods exception exists because the circumstances provide "a basis for believing that the offered oral evidence rests on a real transaction." Therefore, modifications of contracts qualifying for this exception need not be in writing. This rule seems proper because it would be inconsistent to except sales contracts for specially manufactured goods from the signed writing requirement while requiring that modification of those contracts be in writing. . . .

Holland, *Modifications of Sales Contracts: Complying with the Statute of Frauds,* 22 U.C.C. L.J. 301, 314 (1990) (footnotes omitted).

The FsOF find that Contours and the remaining goods described in the orally modified contract satisfied requirements Nos. (1), (3), (4), and (5). But the FsOF do not decide the question whether the orally modified contract's remaining goods were suitable for sale to others in the

ordinary course of Contours' business. On remand, the circuit court must decide this question of fact.

## III.

If the trial court finds that the orally modified contract's goods were suitable for sale to others in the ordinary course of Contours' business and, therefore, that the orally modified contract does not fall under HRS § 490:2–201's specially manufactured goods exception to the statute of frauds, the trial court will then have to decide whether Hawai'i will apply estoppel in these situations. *See generally* 1 J. White & R. Summers, *Uniform Commercial Code* § 2–6 (3d ed. 1988); W. Hawkland, *UCC Series* § 2–201:08 (Art. 2); *see also UCC Case Digest* ¶ 2201.18.

## IV.

If the trial court finds that the orally modified contract's goods were not suitable for sale to others in the ordinary course of Contours' business, then the orally modified contract is enforceable and the following subsections of this opinion apply.

## A.

The issue of whether Lee accepted the goods is governed by HRS § 490:2–606(1)(a) (1985). It provides as follows:

> **490:2–606 What constitutes acceptance of goods.**
>
> (1) Acceptance of goods occurs when the buyer
>
> (a) After a reasonable opportunity to inspect the goods signifies to the seller . . . that he will take or retain [the goods] in spite of their nonconformity; . . .

* * *

Based on FOF No. 16, we conclude that Lee accepted the goods.

### B.

The issue of whether Lee justifiably revoked his acceptance because the goods were nonconforming is governed by HRS § 490:2–608 (1985). It provides as follows:

**490:2–608 Revocation of acceptance in whole or in part.** (1) The buyer may revoke his acceptance of a lot or commercial units whose nonconformity substantially impairs its value to him if he has accepted it

(a) On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; . . .

* * *

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

* * *

FsOF Nos. 17 and 18 find that Lee prevented Contours' reasonable attempts to seasonally cure the nonconformity. For obvious reasons, the law will not permit the buyer who is a cause of the seller's failure to seasonably cure the nonconformity to enjoy any benefit based upon the seller's failure to seasonably cure the nonconformity. Therefore, HRS § 490:2–608 did not authorize Lee to revoke his acceptance.

## C.

The issue of whether Lee had a security interest in the goods and was authorized to retain them as security is governed by HRS § 490:2–711 (1985). It states as follows:

**490:2–711 Buyer's remedies in general; buyer's security interest in rejected goods. . . .**

\* \* \*

(3) On . . . justifiable revocation of acceptance a buyer has a security interest in goods in his possession or control for any payments made on their price and any expenses reasonably incurred in their inspection, receipt, transportation, care and custody and may hold such goods and resell them in like manner as an aggrieved seller (section 490:2–706).

Since Lee did not justifiably revoke his acceptance, he did not have an HRS § 490:2–711 security interest in the goods and was not authorized to retain them as security.

### CONCLUSION

Accordingly, we vacate the circuit court's December 21, 1992 Judgment and remand for further proceedings consistent with this opinion.

*Stuart M. Cowan* (Price Okamoto Himeno & Lum, of counsel, with him on the reply brief), on the briefs for defendant–appellant.

*Thomas L. Mui* on the brief for plaintiff–appellee.