J-A01018-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

DAVID M. WYHER : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
      Appellant :
:
:
:
      v. :
:
:
:
DEVON REGIONAL REALTY, LLC AND : No. 1180 EDA 2020
CYNTHIA ALDRIDGE DICKERMAN :

Appeal from the Judgment Entered May 21, 2020
In the Court of Common Pleas of Delaware County Civil Division at
No(s):  No. CV-2017-004313

BEFORE:   BENDER, P.J.E., OLSON, J., and STRASSBURGER, J.[*]

MEMORANDUM BY OLSON, J.:                                   Filed: April 22, 2021

Appellant, David M. Wyher, appeals from the May 21, 2020 judgment entered upon a non-jury verdict in favor of Devon Regional Realty, LLC ("DRR") and Cynthia Aldridge Dickerman ("Dickerman") (collectively, "Devon") on Appellant's breach of contract claim.  We affirm.

The trial court summarized the procedural and factual history as follows:

On [] September 11, 2017[,] Appellant filed a complaint against [DRR] and [Dickerman at trial court docket] CV-2017-004313 [("Case 4313")] for breach of contract.  Appellant alleged in his complaint that he and Dickerman [] entered into a binding agreement on September 1, 2016[,] in which he obtained a 5% equity stake in DRR for which he was never compensated[.]

On or about December 11 2017[,] Appellant filed a complaint against DRR [at trial court docket] CV-2017-010331 [("Case 10331")] for unpaid compensation that he alleged he was owed consisting of (1) unpaid salary for part of 2017[,] (2) an unpaid

[*] Retired Senior Judge assigned to the Superior Court.

5% owner[-]profit bonus for the period of January 1, 2017[,] through April 26, 2017[,] and (3) unpaid recruiting incentive bonuses.

[]DRR filed a counter[-]claim on October 13, 2017[, at Case 4313,] for an alleged breach of contract by Appellant with regard to a non-solicitation provision [contained] within his employment agreement.

On December 13, 2018[,] the parties entered into a stipulation [agreement] and both [Case 10331 and Case 4313] were consolidated[.[1]]

A two[-]day [non-jury] trial was held [] on November 6, 2019[,] and November 7, 2019. The evidence admitted at trial established that Appellant was hired by [] Dickerman[, who was a principal of DRR[,] on [] July 29, 2013. At the time of Appellant's hire, DRR was owned by two entities, Dickerman, the majority owner, and Devon Agents Investments, LLC[ ("DAI")], a separate entity [owned by several real estate] agent investors[.]

Appellant was hired by Dickerman as a real estate agent for DRR, and more specifically, as a "team leader." As [a] team leader, Appellant was hired to recruit, manage[,] and train [real estate] agents. Following negotiations between Appellant and Dickerman, the parties entered into an employment agreement on July 29, 2013. The agreement provided [that Appellant would receive] a base salary of $60,000 [annually] and laid out the requirements for additional bonus opportunities [for which Appellant was eligible]. These bonus opportunities included recruitment incentive bonuses.

According to Appellant, Dickerman also promised [] that he would be entitled to a 10% equity stake in DRR if he remained with the company for a period of three years. According to Appellant, when he later inquired about said promise, he claimed that Dickerman told him that she would agree to a 5% ownership stake in [DRR]

_____

[1] The record demonstrates that the trial court approved the stipulation agreement on December 17, 2018, but the order approving the stipulation agreement was not entered until February 8, 2019. *See* Trial Court Order, 2/8/19.

and not the 10% [ownership stake] that she had originally promised. According to Appellant, he then conceded that he would take a 5% equity stake in DRR[.] Appellant testified that negotiations regarding the new terms of his compensation lasted several weeks. However, there are no writings memorializing an agreement with regard to any ownership [stake in] DRR. According to Appellant, [his ownership interest in DRR entitled him to receive $70,000.00] at the time of trial[.]

According to Dickerman, at the time of hire, Appellant was not offered an equity stake in DRR. Dickerman testified that she did offer Appellant an opportunity to purchase shares of [DAI. DAI was] an agent[-]owned [limited liability] company[ comprised] of approximately six [real estate] agents[, who] owned approximately 18% of DRR at the time Appellant was hired. According to Dickerman, Appellant was offered the same opportunity to buy [an equity stake in] DAI as other [real estate] agents. However, Appellant declined to do so. Dickerman testified that she never offered anyone, including Appellant, ownership in DRR. [The trial] court found Dickerman's testimony to be credible.

Discussions between Appellant and Dickerman occurred during the summer of 2016 regarding his compensation. As a result of these negotiations, Appellant received a raise in return for performance requirements at a higher level. Appellant's salary was increased from $5,000[.00] per month to $6,250[.00 per] month. Additionally, Appellant was given a 5% owner[-]profit bonus with an effective date of July 1, 2016.[FN3]

[FN3] Dickerman promised Appellant that she would give him 5% of the profits from July[ 2016] through the end of the year.

Evidence established that the parties met in person on September 1, 2016[,] to discuss Appellant's compensation structure at DRR. In support of his claim for breach of contract, Appellant produced three pages of [] notes [handwritten] by Dickerman on September 1, 2016[,] in which she wrote "5% equity/shares" [and] "August <--> 2016." The [third page of the] note[s] was signed by both parties and dated September 1, 2016. According to Appellant[,] this writing was proof of his right to a 5% ownership interest in [DRR.] According to Dickerman, this evidence established

Appellant's right to a 5% owner[-]profit bonus in [DRR.] Again [the trial] court found Dickerman's testimony to be credible.

The parties memorialized this agreement in a [memorandum] that was dated October 14, 2016. There is no mention of any ownership of [DRR] in this document.

On April 10, 2017[,] Appellant was terminated from DRR. According to Appellant, he was terminated because he demanded to be compensated as Dickerman agreed and threatened "to get his lawyers involved." According to Dickerman, Appellant was terminated because he had engaged in inappropriate conduct. Specifically, Appellant had engaged in diverting leads from other [real estate] agents within the company through the use of [the website www.]realtor.com.

Upon his termination, Appellant joined the Keller Williams Bryn Mawr office. At trial[,] Appellant claimed that he was owed $9,452.05 in unpaid salary for the period from April 1, 2017[,] to May 26, 2017, which included a 30[-]day notice period as provided for in his employment agreement. Appellant further claimed that he was owed $95,000[.00] in unpaid recruiting incentive bonuses. Lastly, Appellant claimed that he was owed $5,180.94 in owner[-]profit bonuses from January 1, 2017[,] to April 26, 2017.

Trial Court Opinion, 8/12/20, at 1-4 (record citations, some footnotes, and extraneous capitalization omitted).

In an order dated February 7, 2020,[2] the trial court found in favor of DRR and Dickerman in Case 4313. Trial Court Order, 8/12/20, at ¶A. The trial court held that, Appellant "failed to meet his burden of proof to establish that an enforceable agreement existed between the parties. [Dickerman] never offered an ownership interest in [DRR] to [Appellant] but offered only a purchase option in [the] entity, [DAI.]" *Id.* Appellant filed a post-trial motion,

_____

[2] The trial court order was dated February 7, 2020, but the trial court docket reflects that the order was not filed until August 12, 2020.

- 4 -

which the trial court subsequently denied. Upon Appellant's filing of a *praecipe* to enter judgment in Case 4313, judgment was entered on May 21, 2020. This appeal followed.[3]

Appellant raises the following issue for our review:

Did the [trial] court abuse its discretion [or] commit legal error[] by ruling against [Appellant] in his breach of contract claim against [DRR and Dickerman] because [Appellant] and Dickerman did not having a meeting of the minds [sufficient to constitute] an enforceable agreement[, which required Appellant] to receive [a] 5% [ownership interest in DRR], when such ruling was contrary to relevant principles of Pennsylvania common law [that] the [trial] court was empowered to apply?

Appellant's Brief at 4.

Our standard and scope of review in an appeal from a judgment entered on a non-jury verdict

is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial [court] must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law.

_____

[3] Both Appellant and the trial court complied with Pa.R.A.P. 1925. Case 4313 and Case 10331 were consolidated for purposes of discovery, case management, and trial, but separate non-jury verdicts and separate judgments on the non-jury verdicts were entered at each respective trial court docket. **See** Trial Court Order, 2/8/19. Only the judgment entered on the non-jury verdict at Case 4313 is the subject of this appeal.

*J.J. DeLuca, Co., Inc. v. Toll Naval Associates*, 56 A.3d 402, 410 (Pa. Super. 2012) (citation omitted).

"A contract is formed when the parties to it 1) reach a mutual understanding, 2) exchange consideration, and 3) delineate the terms of their bargain with sufficient clarity." *Company Image Knitware, Ltd. v. Mothers Work, Inc.*, 909 A.2d 324, 330 (Pa. Super. 2006) (citation and original quotation marks omitted), *appeal denied*, 929 A.2d 645 (Pa. 2007).

> Where the existence of an informal contract is alleged, it is essential to the enforcement of such an informal contract that the minds of the parties should meet on all the terms[,] as well as the subject matter. If anything is left open for future negotiation, the informal paper cannot form the basis of a binding contract.

*GMH Assocs., Inc. v. Prudential Realty Group*, 752 A.2d 889, 900 (Pa. Super. 2000) (citation and quotation marks omitted), *appeal denied*, 795 A.2d 976 (Pa. 2000). "[I]n order for an enforceable agreement to exist, there must be a 'meeting of the minds,' whereby both parties mutually assent to the same thing, as evidenced by an offer and its acceptance." *Prieto Corp. v. Gambone Constr. Co.*, 100 A.3d 602, 609 (Pa. Super. 2014) (citation omitted). "In cases involving contracts wholly or partially composed of oral communications, the precise content of which are not of record, courts must look to the surrounding circumstances and course of dealing between the parties in order to ascertain their intent." *Id.* "While courts are responsible for deciding whether, as a matter of law, written contract terms are either clear or ambiguous; it is for the fact[-]finder to resolve ambiguities and find

the parties' intent." ***Windows v. Erie Insur. Exch.***, 161 A.3d 953, 957 (Pa. Super. 2017).

Here, Appellant contends that the September 1, 2016 writing, which was signed by both Appellant and Dickerman, evidenced the parties' meeting of the minds regarding his contractual right to receive an ownership interest in DRR. Appellant's Brief at 13. Appellant asserts that the September 1, 2016 writing conclusively proves that the parties intended that Appellant earned a 5% ownership position in DRR, and not in DAI, as of August 2016, and that he had the option to purchase an additional 1% ownership share in DRR, and not in DAI, for each "capper."[4]. ***Id.*** at 13-16. Appellant argues that, because he was hired as an employee of DRR and he affiliated his real estate sales license with DRR, the entity references in the September 1, 2016 writing refer to DRR and that DRR "was the only business entity in which [he] had been offered the opportunity to buy ownership shares[.]" ***Id.*** at 15-16.

---

[4] We take judicial notice that the term "capper" refers to a Keller Williams real estate agent who has reached a set amount of production, *i.e.* sales volume, and is no longer required to pay a portion of his or her sales commission to the affiliated Keller Williams real estate brokerage office. ***See*** http://www.kwlaquintarealestateschool.com/2018/03/07/cappers-can-earn-100-percent-plus-keller-williams-realty-commission-split/ (last visited April 6, 2021). In other words, a "capper" is a Keller Williams real estate agent who has "capped" his or her commission based upon performance and retains 100% of his or her commission earned on real estate transactions occurring after the cap is achieved.

Finding that Appellant presented insufficient evidence to establish that a contract existed between the parties regarding an ownership interest in DRR, the trial court stated,

> At trial, Dickerman credibly testified that she did not offer Appellant an ownership interest in [DRR]. Dickerman credibly testified that she did provide Appellant with an opportunity to invest in [] DAI, but that he declined to do so.

Trial Court Opinion, 8/12/21, at 7 (record citation omitted). The trial court held that, "the evidence presented showed a lack of any mutual understanding regarding ownership in [DRR.]" *Id.*

A review of the record demonstrates that DRR was a Pennsylvania limited liability company that did business as, *inter alia*, Keller Williams Reality Devon-Wayne. Devon's Exhibits 40-41. As a limited liability company, DRR was owned by Dickerman, who was the operating principal and owned 79% of DRR, and by DAI, a Pennsylvania limited liability company that owned 21% of DRR. *Id.* DAI was owned by a group of real estate agents affiliated with DRR and who, through their affiliation with DRR, purchased ownership interest in DAI. Devon's Exhibits 13, 38-39, 43-44. The members of DAI possessed different ownership percentages in DAI based upon the number of shares of DAI they owned. Devon's Exhibits 38-39.

Appellant was hired as a "team leader" by DRR with an effective start date of July 31, 2013. Devon's Exhibit 18. Appellant's employment agreement was dated July 29, 2013, and contained details pertaining to, *inter alia*, his salary, the commission he would be paid on real estate transactions,

and performance bonuses he may be awarded at the discretion of DRR. ***Id.***

Prior to signing his employment agreement, Appellant was presented with an

"ownership opportunity offer," dated June 24, 2013, which stated,

> [Appellant] can initially buy up to two (2) ownership shares in Devon-Wayne at [the] time of joining [Keller Williams Realty] Devon-Wayne. [Appellant] can purchase one (1) additional share, up to eighteen (18) [shares], per 'capping' agent (excluding [Appellant's] team members) that join [Keller Williams Realty] Devon-Wayne and name [Appellant] as sponsor within 3 years of [Appellant's] join date.

Devon's Exhibit 24 (extraneous capitalization omitted).

On September 1, 2016, Dickerman memorialized a conversation with

Appellant on a copy of this June 24, 2013 ownership opportunity offer. Both

parties signed the writing containing the conversation notes. Included in these

notes were the notations "earned 5% equity/shares," "August <--> 2016,"

and "Buy 1% for each capper *i.e.* Sarah." Appellant contends that these notes

prove that he earned a 5% ownership in DRR and was promised the right to

purchase additional ownership shares in DRR. Appellant's Brief at 14. Devon

contends that Appellant earned a 5% equity in DAI and that, consistent with

ownership purchase opportunities extended to other real estate agents, he

was eligible to purchase additional equity shares in DAI. Devon's Brief at 23.

Because the ownership opportunity offer and conversation notes do not

precisely state whether Appellant earned a 5% equity interest in DRR or DAI,

and because the ownership opportunity offer and conversation notes do not

specify whether Appellant acquired a right to purchase additional equity

interest in either DRR or DAI, we look to the surrounding circumstances and the parties' course of dealing to ascertain the intent of the parties and determine whether there was a "meeting of the minds." *See Prieto Corp.*, 100 A.3d at 609.

In a June 6, 2015 email to Dickerman, Appellant expressed, *inter alia*, that upon being hired, his expectation was that he would eventually receive an ownership stake in Devon Abstract, LLC[5] after two years of employment. Devon's Exhibit 21. In this email, Appellant further stated,

> I knew I would lose money [by] not actively selling real estate, and [I] was willing to risk the exposure with the opportunity to have ownership in the market center. I could at least hedge this VERY small salary with recruiting bonuses to soften the financial loss I would experience with the opportunity to EARN 20% ownership in this company. I can't hedge my loss with something that isn't being paid.

*Id.*

In an August 23, 2016 email to Dickerman, Appellant confirmed his meeting with Dickerman, stating,

> I just want to be clear where you stand regarding my [employment] contract as [team leader] moving forward. I am still a 1099 employee [for income tax purposes] with a base [salary] that moves from [$60,000.00] to [$75,000.00] to help cover the expense of my [family's] health insurance costs, and [with] a 5% equity stake of owner profit over the next 6 months[.]

---

[5] Devon Abstract, LLC is a title company owned by the limited liability company members of DRR and DAI. Devon's Exhibit 45.

Devon's Exhibit 22.  On August 24, 2016, Dickerman responded,

> To clarify this bonus/partner equity stake is to start now retroactive to the last distribution in July [2016].  It will continue going forward, as long as you are an agent at [Keller Williams Realty Devon-Wayne] and in the [team leader] role and meeting the standards[.]  You do not have to buy anything.  We will have a contract that is non-binding legally and based on current and future performance that we both agree on.  You will earn 5% of the owner profit as (K1 or 1099) and you will pay taxes on it.  The distribution will be in late December.  And going forward indefinitely until such time as we make a change to the plans[.]

*Id.*  In an August 26, 2016 email to Alex Coates, a real estate agent and the tax managing partner of DAI,[6] Dickerman wrote,

> August 24, 2016, [Appellant] confirmed *via* email our [August 23, 2016 meeting] that he is offered 5% (earn in) equity with no costs to him and a raise to $75,000[.00] effective immediately.  Also[, he] wanted to know about [a] 10% equity in the [market center] for which he has earned over the last 3 years[.  S]omehow in his mind[,] he has separated the 5% from the 10%.  I have never talked with him or anyone about 10% equity.

Devon's Exhibit 23.

On September 1, 2016, Dickerman and Appellant met in person and signed the copy of the ownership opportunity offer containing notes memorializing their conversation, as discussed *supra*.  Dickerman's summary of her September 1, 2016 meeting with Appellant stated,

> We agreed and initialed that [Appellant] has earned 5% equity/ also called shares from his hiring of 2 cappers who named him as a sponsor thus far through August 2016.  Value of $40,000[.00]

_____

[6] *See* Devon's Exhibit 44.

with [approximately] 20% [return on investment] as of last August 2015.

- Going forward he can buy 1%/1 share of equity for each new capper *i.e.* Sarah [] at $8,000[.00 per share. T]his is consistent with the original ownership offer of 2013.

Devon's Exhibit 25 (underlining omitted).

In November 2016, Appellant and Dickerman signed a performance expectations letter that stated, "this acknowledges the previously agreed upon salary increase to [$75,000.00] and 5% of owner[-]profits bonus beginning July [1,] 2016. This will remain in effect as long as [Appellant] is in the Team Leader role at Keller Williams [Realty] Devon-Wayne to be reevaluated prior to February [3,] 2017[.]" Devon's Exhibit 26.

In considering the evidence in a light most favorable to Devon, as the verdict winner, we concur with the trial court, and the record supports, that the September 1, 2016 writing evidences that Dickerson intended to offer Appellant an earned 5% equity share of DAI and the opportunity for Appellant to purchase additional equity in DAI in 1% increments. Trial Court Opinion, 8/12/20, at 7; *see also J.J. DeLuca*, 56 A.3d at 402 (holding that, a trial court's credibility determinations in a non-jury trial will be upheld unless the appellant can show the trial court's determination was manifestly erroneous, arbitrary and capricious, or flagrantly contrary to the evidence). In the case *sub judice*, Appellant has not come forward with proof that the trial court's credibility determination was manifestly erroneous or that its findings were arbitrary, capricious, or flagrantly contrary to evidence introduced at trial.

Because Dickerman and Appellant, in signing the September 1, 2016 writing, did not confirm their mutual assent to the same terms, namely that references to "equity" pertained to DRR and not DAI as Appellant contends, there was no "meeting of the minds" between the parties. As such, the September 1, 2016 writing does not constitute an enforceable contract that entitled Appellant to an equity interest in DRR. Consequently, Appellant's issue is without merit.[7]

Judgment affirmed.

Judge Strassburger did not participate in the consideration or decision of this case.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

Date: *4/22/21*

---

[7] Moreover, to the extent that Appellant's argument invites this Court to do nothing more than reassess the witnesses' credibility and reweigh the evidence in an attempt to convince us to reach a result different than the one reached by the trial court as fact-finder, we decline Appellant's invitation. ***See Gutteridge v. J3 Energy Group, Inc.***, 165 A.3d 908, 916 (Pa. Super. 2017) (stating, "[a]ssessments of credibility and conflicts in evidence are for the trial court to resolve[. T]his Court is not permitted to reexamine the weight and credibility determinations or substitute our judgments for those of the fact[-]finder" (citation omitted)).